BUCHER VS OVERLEES.

Opinion delivered October 27, 1905.

(89 S. W. Rep. 1021).

1. *Deeds—Contents—Description of Property—Reference to Plat.*

> On an issue as to whether the parties to a conveyance of land had intended that it should be described by a sketch made by them at the time or by a government plat of a town site, evidence *Held,* to show that it was intended that the plat should govern.

2. *Ejectment—Defenses—Equitable Title.*

> In ejectment by a trustee, his legal title will not prevail against the cestui que trust in lawful possession under the trust.

3. *Deeds—Description of Property—Reference to Plat.*

> Lands conveyed are sufficiently described, where it is provided that the description shall be according to a certain plat.

(Ed. Note.—For cases in point, see vol. 16, Cent. Dig. Deeds, §§ 67, 81).

Appeal from the United States Court for the Northern District of the Indian Territory; before Justice Joseph A. Gill, February 3, 1904.

Action by F. M. Overlees against Frank Bucher. From a judgment in favor of plaintiff, defendant appeals. Reversed.

This is an action of ejectment, brought by the appellee against the appellant for the possession of two certain lots of land in the town of Bartlesville, in the Cherokee Nation, I. T. Prior to the time that Bartlesville was surveyed and laid off into a town by the townsite commission, pursuant to the various acts of Congress, including the Cherokee agreement,

agreement, relating to town sites, the two lots of land in controversy were embraced within a 60-acre tract of land, the Indian title and the possession of which was in one Terrapin, a Cherokee Indian. There were no improvements upon it, except, possibly, an old well, and it was fenced and was used as a pasture. It immediately joined the town as then built. When the townsite commission surveyed, platted, and laid off the town into streets, alleys, blocks, and lots, it extended the town so as to embrace this tract within its limits. After it became known that the Terrapin pasture had been thus laid off as part of the town and before the plat was made public, or, presumably, approved by the Secretary of the Interior, a number af persons, principally inhabitants of the old town, as it was called, among them the parties to this suit, conceived the idea that they would take possession of a large number of these unoccupied lots and blocks, for the purpose of giving them the advantage of buying them at their assessed value, or possibly by improving them before the plat should be approved by the Secretary of the Interior, to obtain them at one-half of their assessed value. Without any other authority or right, they entered upon the tract, and proceeded to stake off each for himself, one entire block, containing, as they supposed, six lots. After this was done, Mr. Terrapin and a Mr. Bartles, who in some way was interested with Terrapin, began to give trouble, and threatened a litigtion. To avoid this, these "lot jumpers," as some of them in their testimony designated themselves, known otherwise as the "Commercial Club of the Town of Bartlesville," agreed that a Mr. W. M. Johnstone, an intermarried Cherokee, who possessed the Indian title to an adjoining tract of land that had been by the government survey embraced within the limits of the town, should see Terrapin and Bartles, and "fix the matter with them," each agreeing that he would pay his pro rata share of the cost, whatever it might be. Pur-

suant to this understanding, Johnstone, for the consideration of $600, paid to Terrapin and Bartles, procured from Terrapin a bill of sale, executed jointly to Johnstone and to F. M. Overlees, the appellee, who is a citizen of the Cherokee Nation. This bill of sale is as follows:

"Know all men by these presents, that in consideration of six hundred and no-100 dollars, the receipt of which is hereby acknowledged, I do hereby grant, sell, transfer and deliver unto Wm. Johnstone and F. M. Overlees, his heirs, executors, administrators, and assigns, the following goods and chattels, viz: All of my right, title and interest in and to about sixty acres of land located in the southwest quarter of section twelve (12) township twenty-six (26) range twelve (12) cast, or for a further and better description, what is known as the Terrapin addition to the town of Bartlesville, I. T.    To have and to hold all and singular the said goods and chattels forever.    And said grantor hereby covenants with said grantee that he is the lawful owner of said goods and chattels; that they are free from all incumbrances; that he has good right to sell the same as aforesaid; and that he will warrant and defend the same against the lawful claims and demands of all persons whomsoever, for a period of sixty days from date hereof.

"In witness whereof, the said grantor has hereunto set his hand this 29th day of March, 1902.

his<br>
James X Terrapin."<br>
mark

Afterwards, on April 3, 1902, Johnstone assigned all his right and title in the lease to Overlees, the appellee.    It was testified to by Johnstone that this bill of sale was for the

purpose only of conveying the improvements; and hence a bill of sale of chattels, and not a deed for land, was executed. After the bill of sale was procured, Johnstone and Overlees took a piece of manilla wrapping paper, and on it drew a plat or map of the Terrapin addition to the town of Bartlesville. The old town had been built on blocks 300 feet square, containing each six lots, each lot 100 feet wide and 140 feet long, with an alley 20 feet wide between. Not having the government plat, and not being informed as to what the townsite commission had really done as to the dimensions of the blocks and lots, or the location of the streets and alleys, and taking it for granted that the new town would conform in these particulars to the old, the manilla wrapping-paper map was made to a scale showing each block to be 300 feet square, and containing each six lots of the same dimensions as those in the old town. After its completion, the plat was presented to the gentlemen composing the "Commercial Club of Bartlesville," and it was agreed that one lot, which seems to have been the northeast corner lot, of each block was to be reserved to Mr. Johnstone, for the benefit of some business men, not in the combination, who were expected to build upon them, and thus enhancing the value of the others, leaving for each member of the club five, instead of six, lots. Upon these each paid to Johnstone and Overlees the sum of $50; that is, $10 to the lot, until the $600 paid to Terrapin and Bartles had been secured. And the parties having theretofore taken possession of the blocks, by staking them off, there was nothing more to do. The thing was done. The block (No. 83) in which the two lots in controversy were located, was situated on the southern limits of the town, and was taken by one G. W. M. Purcell, the appellant's grantor, a party to the combination, who, as the others did, paid the sum of $50, or $10 for each lot, to Johnstone and Overlees. When the plat made by the townsite commission was afterwards procured, it was found

that this block contained eight lots instead of six. This was caused by the townsite commission locating the line indicating the southern limits of the town about 100 feet south of the line indicated by the manilla paper plat, where they supposed the line had been established by the townsite commission, thus adding to the block indicated by the manilla paper map nearly two lots at its southern end. And these two lots are the ones in controversy in this suit. Some time after the parties had taken possession under Johnstone, and before it was known how the townsite commission had laid out the town, Overlees, the plaintiff below, procured from Washington a copy of the townsite map, and from it discovered that the two lots had been added to block 83. He at once put a fence around them. The next night Purcell, defendant's grantor took the fence down, and fenced it in himself; and the possession has since been in him and the defendant, his grantee. The defendant claims that, prior to the time the lots were fenced in by the plaintiff, he, the defendant, had taken actual possession of them by putting posts around them, and that plaintiff took these posts down at the time he put his fence around the lots; and possibly used some of them for that purpose. But the plaintiff denies this; and upon this question the proof is coflicting. Upon this state of facts the plaintiff brings this action of ejectment for the possession of the land.

*W. H. Kornegay,* for appellant.

*Preston S. Davis, Denis H. Wilson,* and *O. B. Clevenger,* for appellee.

CLAYTON, J. (after stating the facts).- Whether the transaction relating to the purchase of the Terrapin title constituted the plaintiff a trustee or agent of defendant's grantor, or passed to Johnstone and plaintiff Terrapin's absolute title;

or whether or not the whole transaction was void as being against public policy or statutory law is not necessary, as we deem the case, to be decided. These transactions were all had after the government had entered upon the lands and surveyed and staked it off for a townsite, but before the plat had been approved by the Secretary of the Interior. If that approval, when it was made, had the effect of relating back to the time when the government entered upon the land and surveyed it off into a town, the whole transaction was clearly against public policy and statutory law, and all of the parties being in part delicto, the plaintiff and all others of the parties to it, would be cut off from any remedy; the doors of the courts would be closed against them, and the parties would be left where they left themselves. But this question was not raised at the trial, and it is not necessary for us to consider it.

In our opinion, all questions raised in this case may be eliminated except a single one, and that is, in law, on the facts established, was the transfer of the land from Johnstone and Overlees to defendant's grantor predicated upon the description of it as shown by the pencil plat, or was it as shown by the government map? That there was a mistake in laying off the pencil plat, and that it was intended to correspond with the government map, is admitted by all. At the time of these transactions, the parties did not know where the lines of the blocks or lots were located, or what the size of either was. With them it was a surmise, founded on the assumption that the townsite commission, in these matters, had made the government map to conform to the old town as built. It was further shown that each person was to have a full block, and they took possession of them, as far as it was in their power to do so, with their limited knowledge of the real situation; and this was before the pencil plat was made, and without any reference to it. Indeed, possession was taken even before the

sale of the Terrapin interest. The plaintiff, with the others, took his block, and he was a party to the combination. The plaintiff, in his testimony on this point, says: "Q. Mr. Overlees, what was the purpose in making that plat, to start with—the original plat? A. The original plat was made to designate the different lots that these different parties was to have in this Terrapin addition, (Having reference to manilla plat). Q. It was made to designate also the blocks into which the Terrapin land was divided or to be divided, wasn't it? A. Yes, sir. Q. Did you believe that, at the time you drew this map, that there would be another block south of this one that you have indicated here—the southern corner of it? A. No, sir. Q. You intended to include in this block all of the land in the addition lying south of the street north of this block and designated as 10th street on the official plat and lying east of the street? to the west of it and designated on the official plat as Jennings avenue, did you not? A. No, sir. At the time we made the plat we didn't know where the south limits of the town was. Q. Did you not exhibit this as the plat of the town in reference to which the lots could be disposed of? Did you think that you were leaving any of your town out? A. We didn't know. Q. Did you intend to? A. No, sir. Q. You were one of the original parties that staked out claims? A. Yes, sir. Q. To the Terrapin land? A. Yes, sir. Q. Did you know the other boys were going to stake out claims when you staked yours out? It was an arrangement beforehand that all of you would go down and get a claim, wasn't it? A. Yes, sir. Q. Which block did you take? A. I don't remember without looking at the plat. Q. Did you take what you thought was a block according to the government plat? A. I don't know. Q. Wasn't it the understanding that each man was to get a block according to the government plat? A. Yes, sir, the stakes were there." The stakes alluded to by the plaintiff were

those driven by the townsite commission surveyors, and Mr. Purcell says that those stakes were there and that he took possession to the fence which limited the Terrapin purchase. The plaintiff himself admits that, at the time the block was taken possession of by defendant's grantor, that it was the understanding, known to him and to which he was a party; that he was to get a block according to the survey previously made, but not yet made public, by the townsite commission. By that survey, the two lots in controversy were located within the block that Mr. Purcell had taken possession of. Under these circumstances, is it possible that Purcell is to be deprived of the advantage of a street on one side of his block, and of two corner lots which all believed he was getting, because of the fact that when he paid his proportion of the Terrapin purchase he was shown a pencil plat made on wrapping paper, the streets not named nor the blocks and lots numbered, and intended to be an exact copy of the townsite commission's plat, but turned out not to be so, for the want of proper information, which, at the time it was made, was impossible to obtain? The truth of the matter is, as developed by the proof, that the pencil map, because of the necessities of the situation, was a mere makeshift, intended for a temporary purpose, that of laying before the parties the original plat as nearly as it could under the circumstances be done, and the payment of $10 a lot was merely upon an estimate as to what the block really contained. It may be that, after it was discovered that the block was larger than that shown by the imperfect copy, that the parties to the combination would have a legal or equitable right to recover of Purcell an additional sum to recompense them for having paid more than their share of the purchase money; but this would go to the parties who had overpaid, and not to the plaintiff as the grantor; and, in any event, it would not affect the title to the block of land.

Under the established facts of this case, the transfer of this land by the plaintiff to defendant's grantor was a block of land as designated by the townsite plat, which included all within its exterior boundaries; and as the two lots in controversy were within those boundaries, it included them. The fact is made clear that the plaintiff intended to sell a block according to the townsite plat. The defendant says that it was his intention to buy such a tract of land. And if it be the law that the courts will enforce the intention of the parties to a contract as they understood it at the time, and it is, unless they are otherwise bound by the terms of a written contract, and the parties here were not so bound, it would seem that this ought to determine the controversy in favor of the defendant, instead of the plaintiff, as the jury found. And it would make no difference whether the Terrapin sale to Johnstone and plaintiff resulted in a trust, whereby the grantees became the trustees of the combination which paid the purchase price, or had the effect of transferring to the grantees the absolute Indian title of Terrapin. If a trust arose, it was because of the understanding of the parties to the combination, of which plaintiff was one, and the fact that they paid the whole of the purchase price. If this were a trust, and it probably was, then Johnstone's transfer of his legal title to plaintiff by the written assignment indorsed on the bill of sale, had the effect of a renunciation of the trust as to him, at least, so far as it could be done by him, and leaving the plaintiff the sole trustee with the legal title in him. And this being an action of ejectment, the legal title would prevail, except as against a cestui que trust, in lawful possession under the terms of the trust. Here the defendant by the very terms of the trust, if one existed, was to have the whole block according to the metes and bounds of the townsite plat; that he has got, and no more, and being in possession, as between him and his trustee, the courts will hold him there.

But if there were no trust, and the absolute title were in the plaintiff, the result would be the same, because, under the circumstances of the case and the acceptance by the plaintiff of the purchase price, the transaction was a sale of all of the interest and title to the land possessed by the plaintiff; and the mere fact that, at that sale, the dimensions of the land being sold were indicated by an uncertain and imperfect copy of an authoritative plat which absolutely and to a certainty defined the outside limits of the block being sold, and the plaintiff by his own testimony absolutely knowing that the defendant was striving to obtain, and thought, if he really were not, that he was in possession of such a block and was buying it, would not in law nor in fact limit the dimensions as defined upon the copy, but as defined by the real plat. We use the word "copy" because, although it was not really copied from the original with that plat before them, yet it was intended to be such, or as nearly so as it was in their power to make it; and it was used as such. For the plaintiff now to contend that the sale was not made upon the original and the authoritative plat, but that the dimensions were to be determined by the imperfect, erroneous, and botched copy, or substitute used only temporarily, and because the original could not then be had, is to say the least that can be said of it, a mere quibble, and will avail him nothing. "It is a general and a well-settled rule of law that a deed, for the description of land conveyed, may refer to another deed, or to a map and the deed or map to which reference is thus made is considered as incorporated in the deed itself." McCullough vs Old, 108 Cal. 529, 41 Pac. 420; Ballard's Law of Real Prop. 184.

Here there was no written deed, and therefore the description of the land and the purpose of the copy of the plat must be determined by what they said, and what their understanding was at the time; and this will be considered as their

deed. Suppose there had been a written deed executed in which as to the description of the land, the following clause designating the land should appear: "The following described tract of land, to wit: One block of land, No. 83, as is shown by a copy of a plat hereto attached, which said plat is by the parties hereto not certainly known but supposed and intended to be an exact copy of a plat of the town of Bartlesville, made by authority of the United States government, by its townsite commissioners, but which said government map is not now obtainable, or within the reach of the parties hereto?" Does any one doubt but that that reference to the townsite map in the deed would make it a part of it, and that the description of the land as contained in that map would govern? Is not the intention of the parties made clear by the reference? And this is the exact situation of the parties here, except one contract would be written and the other, except as to the map, is verbal. "Where a deed contains two descriptions, each complete in itself, of the land conveyed, one description including all of the land included in the other, and more besides, the deed passes title to all the land contained in the larger." 4 Ballard, Law Real Prop. § 191; Lake Erie & W. R. Co. vs Whitney, 155 Ill. 514, 40 N. E. 1014, 28 L. R. A. 612, 46 Am. St. Rep. 355. To our minds the proof was so clear and certain that these transactions relating to the limits of the land being sold had reference to the townsite map, which included the land in controversy within the block No. 83, that we are of the opinion, and so hold, that the court erred in overruling the defendant's motion for peremptory instruction to return a verdict for him. At the end of the testimony, the court should have taken the case from the jury by peremptorily instructing them to find for the defendant.

The judgment of the court below is reversed, and the cause remanded.

TOWNSEND, J., concurs. RAYMOND, C. J., not participating.